ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL II

| | | |
|---|---|---|
| CONSTRUCTORA DEL RÍO, INC.<br><br>Parte Apelante<br><br>v.<br><br>CARLOS ARMANDO AVELLANET QUIÑONES, ANGELINA TORRES NEGRÓN<br><br>Parte Apelada | TA2026AP00272 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Aibonito<br><br>Caso Núm.: AI2023CV00625<br><br>Sala: 002<br><br>Sobre: Ejecución de Hipoteca; Propiedad Residencial, Cobro de Dinero - Ordinario |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, el Juez Rodríguez Flores y la Jueza Díaz Rivera.

Díaz Rivera, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de junio de 2026.

Comparece ante *nos*, Constructora del Río, Inc. (Constructora del Río o parte apelante) y nos solicita que revisemos la *Sentencia* emitida el 21 de noviembre de 2025 y notificada el 29 de diciembre de 2025, por el Tribunal de Primera Instancia (TPI o foro primario), Sala Superior de Aibonito. Mediante dicho dictamen, el foro primario declaró *ha lugar* a la reconvención instada por el Sr. Armando Avellanet Quiñones (señor Avellanet Quiñones) y, en consecuencia, ordenó, *inter alia*, a Constructora del Río al pago de la suma de $26,782.44, cobrados en exceso a la obligación de $115,000.00.

Por los fundamentos que expondremos a continuación, *revocamos* el dictamen apelado.

**I.**

Surge del expediente ante nuestra consideración que, el 14 de diciembre de 2023, Constructora del Río incoó una *Demanda* sobre cobro de dinero y ejecución de hipoteca contra el Sr. Armando

Avellanet Quiñones y la Sra. Angelina Torres Negrón (en conjunto, parte demandada o apelada).

Según las alegaciones, el señor Avellanet Quiñones suscribió un pagaré hipotecario a favor de Constructora del Río, o a su orden, por la suma de $112,000.00 más intereses al tipo pactado de 8.00% anual desde el 14 de mayo de 2015 hasta el día de su vencimiento, que sería en o antes del 14 de abril de 2030. Sostuvo que, en aseguramiento del pagaré, el señor Avellanet Quiñones otorgó la Escritura de Primera Hipoteca Número 16 otorgada en Aibonito, Puerto Rico, el 5 de mayo de 2015, ante el Notario José Aponte Colón. Manifestó que, en virtud de los referidos instrumentos, y por razón de haber incumplido con los pagos mensuales según pactados, la parte demandada adeudaba la suma de $84,269.38 por concepto de principal, más intereses. Sostuvo que ante dicho incumplimiento, y al amparo del derecho que le confería el pagaré, declaró tales sumas vencidas, líquidas y exigibles en su totalidad.

A su vez, añadió que, tras realizar un estudio de título, previo a la presentación de la demanda, advino en conocimiento de que la señora Torres Negrón adquirió la propiedad objeto del pleito por Dación en Pago por parte del señor Avellanet Quiñones por la suma de $112,000.00, sin que dicha transacción le fuera notificada o se le realizara pago alguno. Concluyó que, siendo el pagaré pagadero a la orden y estando en posesión de este, era su tenedora y, por lo tanto, era la persona con derecho a exigir su cumplimiento. Por tal razón, solicitó que se dictara sentencia ordenando a los demandados a satisfacer la suma de $84,269.38 por concepto de principal, más intereses al tipo pactado de 8.00% anual, desde el 1 de diciembre de 2020. En consecuencia, requirió que se ordenara al Alguacil del Tribunal que procediera a vender la propiedad en pública subasta al mejor postor, libre de cargas y gravámenes posteriores.

Oportunamente, el 6 de febrero de 2024, la parte demandada presentó su *Contestación a Demanda, Defensas Afirmativas y*

*Reconvención.* En esta, negó la mayoría de las alegaciones y admitió otras. Como defensa afirmativa, incluyó, entre otras cosas, que no adeudaba ni reconocía adeudar, en el pasado ni en el presente, suma de dinero alguna que tuviera que ver con la reclamación del pleito. Sostuvo que, por el contrario, la obligación de pago a la que aludía la demanda había sido pagada en exceso de lo debido.

De otra parte, el señor Avellanet Quiñones reconvino alegando que allá para el año 2012 estableció una relación cordial con el Sr. José Manuel Pérez Reyes, también conocido como "Tito Pérez", quien le ofreció arrendar un inmueble en un desarrollo conocido bajo el nombre de Urbanización Panoramas de Aibonito. Indicó que, a su vez, acordó adquirir por compra el inmueble que le sería cedido en arriendo, pactando inicialmente como precio de venta $117,000.00 y, posteriormente, $115,000.00. Sostuvo que, efectuó diversos abonos en dinero efectivo, según le fue requerido por el vendedor, entre enero de 2013 y octubre de 2014, que ascendieron a la suma de $63,000.00. Adujo además que entregó como abono al balance del precio de venta pactado, un vehículo de motor valorado en $36,000.00, así como $6,000.00 adicionales, a razón de $1,000.00 mensuales, en dinero efectivo. Razonó que, aplicados los pagos parciales y abonos realizados al Sr. José Manuel Pérez Reyes, le quedaba un balance pendiente de $10,000.00, que conforme a la dinámica informal de la relación contractual y la relación de confianza entre ambos sería satisfecha mediante abonos hasta el saldo total de lo adeudado.

No obstante, añadió que luego de un tiempo, el Sr. José Manuel Pérez Reyes le devolvió el vehículo de motor colocado en su posesión y le indicó que firmarían la escritura de venta de la casa. Reclamó que al momento de firmar se le requirió firmar un pagaré por la suma de $112,000.00 y una escritura constituyendo garantía hipotecaria sobre el inmueble, a favor de Constructora del Río, quien figuraba como vendedora del inmueble. Expresó que le señaló al Sr.

José Manuel Pérez Reyes las incongruencias entre el balance adeudado expresado en los documentos y los pagos efectuados, pero este le indicó que más adelante efectuarían el ajuste del balance adeudado. Así, expuso que en adición a los $69,000.00 entregados en efectivo al Sr. José Manuel Pérez Reyes, efectuó 68 pagos mensuales adicionales consecutivos de $1,070.33, según se le requirió, para un gran total de pagos de los plazos mensuales de $72,782.44 que, sumados a los $69,000.00 previamente abonados, sumaban la cantidad de $141,782.44. Por lo que, aseveró que pagó la suma de $29,782.44 en exceso del precio de venta estipulado por el inmueble. Por tal razón, concluyó que no solo no adeudaba a quien promovía la acción, sino que era Constructora del Río quien le adeudaba la suma pagada en exceso, con sus intereses, a una cantidad no menor del 8% anual.

Por su parte, el 16 de febrero de 2024, Constructora del Río instó su *Contestación a Reconvención*. En esta, negó la mayoría de las alegaciones en su contra. Alegó que el señor Avellanet Quiñones nunca envió una comunicación escrita al señor Pérez Reyes solicitándole que cambiara el balance del principal reflejado en la libreta con la que pagaba la hipoteca que gravaba la propiedad objeto de controversia. A su vez, negó por falta de información o creencia, que el señor Avellanet Quiñones hubiese efectuado abonos ascendentes a $69,000.00 o que la entrega del vehículo de motor hubiese sido un abono al principal. Indicó que dichos abonos no se reflejaron en el pagaré, escritura de compraventa e hipoteca porque no fueron realizados. Además añadió que el señor Avellanet Quiñones no satisfizo la hipoteca que gravaba la propiedad objeto de la demanda y que el balance de la hipoteca a diciembre de 2020 era de $84,774.55, por lo que no procedía que se endosara el pagaré para su cancelación.

Posteriormente, el 13 de mayo de 2024, los demandados presentaron una *Moción Solicitando Desestimación de Demanda por*

*Falta de Capacidad Jurídica.* Arguyeron que Constructora del Río incumplió con su obligación legal de radicar los informes anuales corporativos y que, a pesar de los apercibimientos y notificaciones cursados previo a la presentación de la demanda, hizo caso omiso de los requerimientos formulados por el Registro de Corporaciones del Departamento de Estado de Puerto Rico. Sostuvieron que la cancelación del certificado de incorporación que dio vida jurídica a Constructora del Río le privó de legitimación y de aquellos derechos constitucionales sustantivos para entablar reclamaciones. De manera que, no teniendo Constructora del Río capacidad jurídica para demandar y promover la acción de epígrafe, pues no era ya una entidad incorporada, el único remedio disponible era decretar la desestimación del pleito de epígrafe.

Luego, el 23 de mayo de 2024, Constructora del Río presentó una *Solicitud de Sustitución de Parte Demandante* mediante la cual sostuvo que la acreencia objeto del pleito fue cedida a favor del Sr. José Manuel Pérez Malavé (señor Pérez Malavé). Por tal razón, solicitó que, a tenor con las disposiciones de la Regla 22.3 de Procedimiento Civil, este fuera sustituido como parte demandante para continuar con la reclamación. A su vez, presentó una *Moción al Expediente Judicial* en la cual anejó la resolución corporativa donde se acreditaba la transferencia del pagaré hipotecario a favor del señor Pérez Malavé.

El 28 de mayo de 2024, la parte demandante presentó una *Moción en Réplica y Oposición a "Solicitud de Sustitución de la Parte Demandante" [...].* En esta, arguyó que la solicitud fue sometida sin apoyo documental alguno que justificara las circunstancias fácticas y jurídicas subyacentes a la alegada cesión de crédito litigioso. A su vez, levantó cuestionamientos sobre la resolución corporativa presentada por Constructora del Río, señalando que presentaba deficiencias y que se llevó a cabo en un momento en que la corporación no tenía personalidad jurídica para celebrar contratos

ni para continuar sus negocios regulares. Asimismo, reiteró su petición de desestimación.

En la misma fecha, Constructora del Río presentó su *Oposición a la Solicitud de Desestimación*. En esta, alegó que la corporación no estaba bajo un proceso de disolución ni de liquidación, sino que, luego de haberse presentado el pleito de epígrafe, meramente hubo una cancelación de su certificado de incorporación. Arguyó que, si bien era cierto que para que una corporación naciera a la vida jurídica era necesario que el Departamento de Estado expidiera el certificado de incorporación, la cancelación de este no implicaba automáticamente la muerte de la corporación. En ese sentido, sostuvo que la parte demandada intentaba equiparar la cancelación del registro con la disolución y liquidación de una corporación, sin que ello fuese así. Puntualizó que la demanda fue presentada previo a la cancelación del certificado de incorporación, lo que no implicaba una disolución ni liquidación de la corporación, pero aclaró que aún si el tribunal entendiera que la corporación estaba bajo un proceso de disolución, la propia Ley General de Corporaciones le concedía un término de tres (3) años iniciales para que esta se disolviera y un término adicional para liquidar los bienes.

El 31 de mayo de 2024, Constructora del Río presentó una *Réplica a Moción en Réplica y Oposición a "Solicitud de Sustitución de la Parte Demandante" […]*. Indicó que, siendo el pagaré del caso un instrumento negociable, la cesión de la acreencia realizada no constituyó un crédito litigioso. A esos efectos, sostuvo que la resolución corporativa anejada a la *Moción Escrito al Expediente Judicial* reflejó el tipo de cesión llevada a cabo, por lo cual no se requería ninguna otra formalidad. Así, concluyó que bastaba una resolución corporativa para que el foro primario tomara

conocimiento de la acción corporativa mediante la cual se adjudicó al señor Pérez Malavé la acreencia del presente caso.

El 2 de julio de 2024, el foro primario emitió una *Orden* declarando *no ha lugar* a la solicitud de sustitución de parte instada por Constructora del Río y, a su vez, declaró *no ha lugar* a la solicitud de desestimación instada por la parte demandante. Asimismo, notificó una *Resolución* mediante la cual determinó que no procedía la desestimación de la demandada aunque Constructora del Río tuviera el certificado cancelado y su personalidad jurídica limitada. Razonó que la corporación conservaba la continuación limitada de su personalidad jurídica corporativa por tres (3) años luego de su cancelación en el Registro de Corporaciones, con el único propósito de llevar adelante pleitos en favor o en contra de ésta, así como para terminar y liquidar la corporación. Concluyó, además, que la cesión de interés expresada en la resolución corporativa era *nula ab initio*. Ello pues vulneraba la cancelación emitida por el Departamento de Estado al ser un acto no incluido dentro de las limitaciones de operación permitidas conforme al Art. 9.08 de la Ley General de Corporaciones. Por tanto, no autorizó la sustitución de parte.

Luego, el 17 de julio de 2024, la parte demandada presentó una *Moción en Solicitud de Reconsideración [...]* reiterando su solicitud de desestimación bajo el argumento de que Constructora del Río carecía de capacidad jurídica y no gozaba de la capacidad jurídica extendida que reconoce la ley con el propósito de viabilizar la liquidación de la corporación.

Por su parte, el 18 de julio de 2024, Constructora del Río presentó su *Moción en Oposición a "Moción en Solicitud de Reconsideración" [...]* puntualizando que para que una corporación muriera jurídicamente era necesario formalizar un proceso de disolución. En ese sentido, añadió que, aun si se efectuase el proceso de disolución, este no conllevaba automáticamente la extinción de la personalidad jurídica de la corporación sino que, por

virtud de ley, ésta se extendía por un período de tres (3) años contados a partir de la fecha de la disolución, para, entre otras cosas, realizar las gestiones pertinentes con el propósito de finiquitar la gestión corporativa.

Así las cosas, el 22 de julio de 2024, el foro de instancia declaró *no ha lugar* a la solicitud de reconsideración sobre la desestimación instada por la parte demandada contra Constructora del Río, reconociendo su ejercicio limitado para tramitar el caso, a tenor con el Artículo 9.08 de la Ley de Corporaciones.

Posteriormente, el 15 de octubre de 2024, Constructora del Río presentó una *Solicitud de Sentencia Sumaria.* Alegó que no existían controversias de hechos materiales que justificaran la celebración de un juicio en su fondo, por lo que el tribunal podía tomar por probados los hechos aseverados en la demanda, los cuales surgían de documentos auténticos firmados por la parte demandada. Manifestó que, resultaba un hecho incontrovertible que la parte demandada suscribió una facilidad de crédito mediante la cual Constructora del Río le otorgó un pagaré con garantía hipotecaria y que la parte demandada le adeudaba la suma principal de $84,269.38 por concepto de principal, más intereses al tipo pactado de 8.00% anual desde el 1 de diciembre de 2020. A su vez, añadió que, si bien la parte demandada alegó haber realizado pagos en efectivo por la cantidad de $63,000.00, dichos pagos fueron realizados previo al otorgamiento de la escritura sobre hipoteca en garantía de pagaré y, a su vez, sostuvo que no existía evidencia alguna que acreditara que la parte demandada realizó algún abono posterior al otorgamiento y constitución de la referida escritura. Así, concluyó que procedía la adjudicación del pleito por la vía sumaria.

El 1 de noviembre de 2024, la parte demandada presentó un escrito intitulado *Moción para que se Declare No Ha Lugar de Plano la Solicitud de Sentencia Sumaria de la Parte Demandante.* En

específico, señaló que la solicitud de sentencia sumaria interpuesta por Constructora del Río no cumplió con los requisitos de forma establecidos en la Regla 36.3 de Procedimiento Civil, *infra*. Por tal razón, arguyó que no tenía obligación de comparecer en autos a oponerse a una solicitud que no cumplía con los mandatos reglamentarios y concluyó que la referida solicitud debía ser rechazada de plano por el tribunal.

Evaluados los escritos de ambas partes, el 9 de diciembre de 2024, el foro primario emitió una *Resolución* mediante la cual declaró *no ha lugar* a la solicitud de sentencia sumaria presentada por Constructora del Río y, a su vez, formuló determinaciones de hechos materiales que entendió no estaban en controversia y aquellos que sí lo estaban. En específico, el tribunal determinó que los siguientes hechos materiales estaban realmente y de buena fe controvertidos:

1. Si los abonos efectuados en efectivo por el demandado a Don Tito Pérez, entre enero de 2013 y octubre de 2014, fue por la suma de $63,000.00.

2. El precio original de la compraventa fue $112,000.

3. Si la deuda de la parte demandada a Constructora del Río, Inc., es de $84,269.38 por concepto de principal.

4. Puede la parte demandante Constructora del Río, Inc. acreditar los pagos mensuales dirigidos a CAWAPE Construction Inc., cada uno por la suma de $1,070.33 que totalizan $72,782.44, según requerido a la parte demandada, para que así pagara su obligación garantizada por el pagaré hipotecario.

5. Si se liquidaron los activos de Constructora del Río, Inc. y se transfirió el pagaré a otra persona.

Luego de varias incidencias procesales, el juicio en su fondo se llevó a cabo los días 16 y 18 de junio y 7 de julio de 2025. Durante el primer día pautado para juicio, el tribunal determinó que Constructora del Río no poseía legitimación activa para solicitar la ejecución de la hipoteca por lo que desestimó la demanda.

Entretanto, el 17 de junio de 2025, Constructora del Río presentó una *Moción Solicitando Desestimación de Reconvención*. En esta, señaló que el mismo día del inicio del juicio el foro primario

emitió un dictamen parcial mediante el cual desestimó la demanda por falta de legitimación activa, al haberse acreditado el endoso del pagaré en controversia a favor del señor Pérez Malavé. Sostuvo que, desde que se notificó la cesión de la acreencia la parte reconviniente no enmendó su reconvención para incluir alegaciones ni para traer como parte indispensable para hacer valer sus reclamos al nuevo acreedor, el señor Pérez Malavé, a pesar de que tenía conocimiento del endoso. En virtud de ello, arguyó que continuar con el trámite de la reconvención sin que se hubiese traído al pleito a la persona contra quien verdaderamente debía ir dirigida, resultaba en una adjudicación sin jurisdicción y contraria al debido proceso de ley. Así, concluyó que procedía desestimar la reconvención por falta de legitimación pasiva y por la ausencia de parte indispensable.

Por su parte, el 24 de junio de 2025, la parte demandada presentó su *Réplica en Oposición a "Moción Solicitando Desestimación de Reconvención"*. Sostuvo que, a la fecha en que alegadamente el señor Pérez Malavé advino en posesión del pagaré, dicho instrumento carecía de valor, pues la deuda que alegadamente el mismo representaba ya había sido pagada en su totalidad. A su vez, adujo que haberse desprendido Constructora del Río del pagaré, lo cual le valió la desestimación de la demanda, no implicaba que tuviera inmunidad para responder por los reclamos formulados en su contra por vía de la reconvención. En ese sentido, expuso que el reclamo formulado perseguía que el tribunal decretara, no solo que el reconviniente satisfizo el precio de venta del inmueble, sino que pagó mayor cantidad que la que le correspondía, y que el remedio procedente ante ello, no era solo que se impusiera que el reconvenido devolviera lo pagado en exceso, sino que lo devolviera con intereses. De manera que su reclamo no guardaba relación con quien tenía en la actualidad el pagaré, sino cuando se efectuó el pago del precio de venta del inmueble, por lo que solicitó que se denegara la solicitud de desestimación.

El 27 de junio de 2025, pero notificada el 1 de julio de 2025, el foro primario emitió una *Orden* mediante la cual declaró *no ha lugar* a la solicitud de desestimación de la reconvención. En cuanto a las alegaciones sobre los pagos realizados y el alegado crédito generado por la parte demandada contra Constructora del Río, antes de la presentación del caso y de la transferencia del pagaré hipotecario al señor Pérez Malavé, expuso que había legitimación activa de ambas partes. Aseveró que en la reconvención no se impugnó la escritura de hipoteca ni el pagaré sino que las alegaciones giraban sobre la compraventa inicial y los alegados pagos realizados para satisfacer dicha obligación. Además, razonó que concluir que la determinación que en su día tomase podría afectar al tercer tenedor del pagaré sería especular.

Así las cosas, tras examinar la prueba desfilada ante sí, el 21 de noviembre y notificada el 29 de diciembre de 2025, el foro primario emitió la *Sentencia* que hoy revisamos. Mediante su dictamen, el TPI declaró *ha lugar* la reconvención y ordenó, *inter alia*, a Constructora del Río al pago de los $26,782.44, cobrados en exceso a la obligación de $115,000.00 y a recuperar el pagaré transferido con el propósito de entregarlo al deudor para la correspondiente cancelación.

Además, tras aquilatar la prueba documental y testimonial vertida en el juicio, el foro apelado procedió a formular las siguientes determinaciones de hechos:

1. Que el señor José Manuel Pérez Reyes, también conocido como Tito Pérez y el señor Carlos Armando Avellanet establecieron inicialmente un contrato para el arrendamiento de la residencia en la Urbanización Panorama de Aibonito número E-24, Aibonito Puerto Rico, a finales de año 2012.

2. Que el señor José Manuel Pérez Reyes, estableció un contrato verbal con el señor Avellanet, a principios del año 2013, para la compraventa de la propiedad alquilada por este último, en la Urbanización Panorama de Aibonito E-24, Aibonito Puerto Rico, por el precio final convenido de $115,000.

3. Que, entre febrero 2013 a octubre 2014, el señor Avellanet le pagó directamente al señor Pérez, en efectivo y para el precio convenido para la compra de la residencia

antes mencionada, la cantidad de $63,000. Este hecho fue aceptado por ambas partes en el informe de conferencia preliminar entre abogados presentado el 30 de octubre de 2024, a la entrada [146] de SUMAC, pág. 14, sección III incisos (1 y 2). Además, estos pagos fueron descritos en la vista y creídos por este Tribunal, constan marcados como prueba estipulada por las partes constan a la entrada [159] de SUMAC Exh. I-documento Titulado - Pagos de la Casa en Efectivo a Don Tito Pérez; para este propósito son los siguientes:

a. El 4 de febrero de 2013, don Tito Pérez le entrega la llave al señor Avellanet de la residencia E-24 de Panoramas de Aibonito.

b. El 7 de febrero de 2013, el señor Avellanet le entregó un pago de $5,000 para la instalación de puertas y ventanas en la estructura.

c. El 7 de marzo de 2013 entrega una opción de compra por la cantidad de $25,000. Véase recibo entregado al deudor, recibo de CAWAPE Construction, Inc. de fecha de 26 de marzo de 2013, donde se ratifica el precio de la compraventa acordado mediante el contrato verbal de $115,000, opción pagada de $25,000 quedando un balance de $90,000 y que fue pagado en efectivo; entrada [142] de SUMAC, anejo 8, pág. 125.

d. Se realizaron nueve (9) abonos de dos mil quinientos ($2,500) dólares cada uno en las siguientes fechas: 2 abril, 13 de mayo, 5 de junio, 4 de julio, 5 de agosto, 2 de septiembre, 10 de octubre y 7 de noviembre, todos del año 2013.

e. El 2 de enero de 2014 se realizó un abono de cinco ($5,000) dólares.

f. El 14 de febrero de 2014 se realizó un abono de mil ($1,000) dólares.

g. Se realizaron tres (3) abonos de mil quinientos ($1,500) dólares cada uno en las siguientes fechas: 8 de julio, 20 de agosto, 2 de octubre, todos del año 2014.

h. Total de lo pagado, sesenta y tres mil ($63,000) dólares.

4. Entre los meses de noviembre 2014 a abril 2015, el deudor señor Avellanet realizó seis (6) pagos mensuales en efectivo de mil ($1,000) dólares cada uno directamente al señor Tito Pérez, para un total de seis ($6,000) dólares. De estos pagos no existe evidencia documental alguna, se dio credibilidad al testimonio del señor Avellanet y al conocer la conducta de la forma del trámite del negocio previo a otorgar las escrituras.

5. Para 13 de mayo de 2014 se realizó la entrega de un vehículo Mercdes-Benz (inscrito a nombre de Angelina Torres), por parte del señor Avellanet al señor Pérez como pago en especie, valorado en $36,000 para acreditarse a la obligación de la compraventa. Luego, el acreedor de la obligación, el señor Tito Pérez, quien lo aceptó y realizó el correspondiente traspaso en el Departamento de Transportación y Obras Públicas (DTOP). El 22 de mayo de 2015, el señor Pérez devuelve la unidad al deudor, señor Avellanet y se realizó el correspondiente traspaso

ante el DTOP, sin hacerse cálculo alguno por el uso y disfrute del bien por ese tiempo. Véase entrada [159] de SUMAC, Exhibit II por estipulación. Ante este hecho alegado y demostrado por laspartes, el tribunal no lo está considerando como pago de la obligación original de la deuda.

6. Que este Tribunal establece como hecho, que de la obligación contractual de compraventa de la residencia E 24 de la Urbanización Panorama de Aibonito, cuyo precio acordado fue ciento quince mil ($115,000) dólares. Al 31 de abril de 2015, el deudor había pagado al vendedor Tito Pérez la cantidad de sesenta y nueve mil ($69,000) dólares. Por lo que a esa fecha, existía un balance adeudado de la obligación de pago de cuarenta y seis mil ($46,000) dólares.

7. Que es un hecho reconocido por ambas partes, que el 5 de mayo de 2015, fue otorgada la escritura de compraventa de la residencia antes mencionada, donde la parte vendedora allí establecida, fue Constructora del Río, Inc. representada por el señor José Manuel Pérez Reyes. En esa misma fecha se otorgó un pagaré y escritura de Constitución de Hipoteca con un pagaré en garantía sobre el inmueble antes mencionado por la cantidad de $112,000, siendo estos instrumentos públicos otorgados ante el Notario José Bolívar Aponte, hijo. Véase entrada [159] de SUMAC, Exhibits VII y VIII por estipulación.

8. Estos documentos fueron presentado e inscritos ante el Registro de la Propiedad, sección de Barranquitas, finca 16012 de Aibonito. Véase entrada [142] de SUMAC, anejo 5.

9. Que el 4 de mayo de 2015, se entrega y recibe el señor Avellanet una libreta de pagos, para satisfacer la obligación hipotecaria que se recogería en la Escritura # 16 de Hipoteca en garantía de pagaré y en el Pagaré, otorgado el 5 de mayo de 2015. En este documento se instrye a que los pagos se realicen a CAWAPE Construction, Inc. Véase recibo en la entrada [159] de SUMAC, identificación 8.

10. Que, a partir de mayo 2015, el deudor, señor Avellanet, realizó 68 pagos por $1070.33 cada uno a favor de Cawape Construction, Inc. una corporación propiedad del señor "Tito" Pérez. Así lo reconocen ambas partes en el informe de conferencia preliminar entre abogados presentado el 30 de octubre de 2024, a la entrada [146] de SUMAC, pág. 14, sección III incisos (11) y pág. 15, inciso (12). A la entrada [159] de SUMAC, identificación 10 a la identificación 70.

11. No existe ningún pago realizado a favor de Constructora del Río, Inc.

12. Que según determinado en el hecho numero 6 anterior, al comenzar el deudor a realizar los pagos con libreta a partir de mayo de 2015, el saldo del balance adeudado se realizó con el pago de diciembre de 2018.

13. Que en el formalismo de la otorgación de las escrituras de Segregación y Compraventa, escritura 15 y la de Hipoteca en garantía de Pagaré, escritura 16, ambas del 5 de mayo de 2015 ante el Notario José Bolívar Aponte, hijo; no hubo entrega alguna de contraprestación ya que el consentimiento, objeto y la causa de la compraventa y traspaso de la propiedad en cuestión se había prestado recíprocamente desde febrero de 2013, mediante un

contrato verbal entre José Manuel Pérez Reyes y el señor Avellanet.

14. Las escrituras mencionadas no hacen referencia alguna a las obligaciones prestadas por el señor José Manuel Pérez Reyes y el señor Carlos Avellanet previo a ese acto y éste último en ningún momento ha impugnado la validez de las escrituras ni del pagaré.

15. Tampoco se hace mención en las referidas escrituras, del acto propio del señor Pérez Reyes, de tramitar los pagos de la obligación que suponían estar garantizados por el pagaré, al pago de Cawape Construction, Inc.; como quedó establecido en el recibo de la libreta de pagos entregada al deudor el día antes del otorgamiento de las escrituras, o sea el 4 de mayo de 2015. Véase entrada [159] de SUMAC anejo Id. 8.

16. Que el señor Avellanet fue instruido por el señor Tito Pérez para que fuera a firmar las escrituras, basado en la relación de amistad existente entre ellos. El Tribunal ponderó que el señor Avellanet es doctor, una persona educada que sabe leer y escribir, por lo que pudo muy bien exigir en aquel momento que se incluyera en el documento la relación previa del negocio que se estaba recogiendo en las escrituras y no se hizo. Análisis al amparo de la doctrina de los actos propios.

17. Que luego de la otorgación de las escrituras, le informó verbalmente a don Tito Pérez en varias ocasiones que no se reflejaba los pagos realizados previamente a las escrituras. Ante esto el señor Pérez le informó que siguiera realizando los pagos con la libreta y cuando se generara la próxima libreta de pagos se corregiría el balance. Testimonio vertido por el señor Avellanet, que el Tribunal le dio credibilidad, tomado en conjunto con los documentos presentados, el uso indistinto por el señor Pérez Reyes y sus personas jurídicas (corporaciones Constructora del Río y Cawape) para distintas representaciones nos lleva a concluir que era la operación personal del señor Pérez Reyes en acción.

18. De la prueba presentada el último pago realizado por el señor Avellanet fue el 1 de diciembre de 2020 con el cheque 827. Véase entrada [159] de SUMAC, Identificación 70.

19. Es un hecho establecido que el señor José Manuel Pérez Reyes falleció el 21 de septiembre de 2020. Véase Informe de conferencia preliminar entre abogados, entrada [146] de SUMAC, pág. 15, sección III inciso 13.

20. Luego de realizado el último pago por el señor Avellanet en diciembre 2020, a Cawape, Construction, Inc., el señor Avellanet le dirige varias comunicaciones a la señora Carmen L. Pérez Malavé hija de don Tito Pérez, para el envío de la nueva libreta y la corrección del balance adeudado según dialogado con el señor Tito Pérez. Véase los Exhibit III, IV y V por estipulación, cartas del 23 abril de 2021, 19 de mayo de 2021 y 19 de enero de 2022, entrada [159] de SUMAC.

21. Al momento de enviar esas comunicaciones el señor Avellanet no conocía con certeza el balance adeudado.

22. Estas comunicaciones no fueron contestadas y solo se procedió a enviar otra libreta de pagos con el mismo pago mensual de la anterior.

23. Constructora del Río, Inc. no recibió ningún dinero por el pago de la compraventa de la propiedad E-24 de Panoramas de Aibonito.

24. Al amparo de la sección 2-302(e), tenedor de buena fe, de la Ley de transacciones comerciales de Puerto Rico, el tenedor del pagaré por el traspaso posterior a la presentación del caso y la contestación y reconvención, el señor Pérez Malavé como accionista de Constructora del Río, Inc. acto declarado nulo por este Tribunal; por lo que obligación de la parte reconvenida, Constructora del Río, Inc. recuperar el pagaré.

25. A pesar de que el señor José Manuel Pérez Malavé, no es parte del caso, se ve impedido de exigir el cumplimiento del instrumento ya que no es tenedor de buena fe, según definido en la sección 2-302. Tenedor de buena fe, de la Ley de transacciones comerciales de Puerto Rico.

26. La demanda presentada en este caso fue el 14 de diciembre de 2023, por Constructora del Río, Inc. Véase entrada [1] de SUMAC.

27. La contestación y reconvención fue presentada el 6 de febrero de 2024. Véase entrada [11] de SUMAC.

28. La contestación a la reconvención fue presentada el 16 de febrero de 2024. Véase entrada [16] de SUMAC.

29. El 30 de diciembre de 2023, el Departamento de Estado de Puerto Rico canceló el certificado de Constructora del Río, Inc. por incumplir con la presentación de los informes y pagos anuales para los años 2020, 2021 y 2022. Véase entrada [62] de SUMAC, anejos 1 y 2.

30. El 17 de mayo de 2024, Constructora del Río, Inc. celebró una reunión de la Junta de directores y le cedieron el pagaré objeto de la reclamación presentada en este caso a José Manuel Pérez Malavé, quien ya conocía de la demanda, de la contestación y reconvención presentadas para esa fecha. Véase anejo en la entrada [68] de SUMAC.

31. Que el 23 de mayo de 2024, la parte demandante Constructora del Río, Inc. solicitó al Tribunal la sustitución de parte para que el señor José Manuel Pérez Malavé continuara el caso como demandante, ya que alegadamente era el nuevo tenedor del pagaré en cuestión. Véase la entrada [67] de SUMAC.

32. El Tribunal emitió una Resolución declarando nula "ab initio" la alegada cesión o traspaso del pagaré ya que tenía su certificado de incorporación cancelado en esa fecha y ese acto (que era una de las actividades de la corporación según sus estatutos) no es una de las actividades permitidas a una corporación con su certificado cancelado. Ante ese hecho denegó la sustitución de parte. Véase entrada [99] de SUMAC, notificada el 2 de julio de 2024, advino a ser final y firme al no ser apelada.

33. El señor José Manuel Pérez Malavé, no intervino ni fue traído al caso por ninguna de las partes, continuó su participación como representante de Constructora del Río, Inc.

34. Luego, el 8 de enero de 2025, se restauró la certificación de la corporación Constructora del Río. Véase entrada [172] de SUMAC.

35. Ante el hecho anterior y consiente de que no se había disuelto la corporación y que la restauración conlleva la validación de los actos celebrados en el ínterin, el 11 de febrero de 2025, el Tribunal ordenó a la parte demandante certificar qué "persona es el tenedor del pagaré objeto de este caso, informando además la fecha, instrumento, forma y lugar donde se hizo la transferencia, si alguna. PARA ESTO SE LE CONCEDEN A LA PARTE DEMANDANTE DIEZ (10) DÍAS PARA PRESENTAR ESTA INFORMACIÓN." La parte demandante procedió a ejercer su derecho de revisión a otras determinaciones de este Tribunal en el Tribunal de Apelaciones, pero en cuanto a esta orden, no se cumplió. Véase entrada [184] de SUMAC.

36. El 18 de junio de 2025, previo al comienzo del juicio, el Tribunal le solicitó esa información a la parte demandante, se confirmó que el tenedor del pagaré era José Manuel Pérez Malavé, quien no era parte del caso. Se desestimó la demanda y se procedió a atender las alegaciones presentadas en la reconvención. Véase entrada [228] de SUMAC.

37. En resumen, se establece como hecho que el señor Avellanet pagó sesenta y nueve mil ($69,000) dólares directamente a José Manuel Pérez Reyes. Luego realizó 68 pagos mensuales a $1,070.33 pagados a Cawape Construction, Inc. que equivale a la cantidad de setenta y dos mil setecientos ochenta y dos dólares con cuarenta y cuatro centavos ($72,782.44). Por lo que el total pagado hasta diciembre 2020, fue de ciento cuarenta y un mil setecientos ochenta y dos dólares con cuarenta y cuatro centavos ($141,782.44).

38. Incluso queda demostrado que el señor Avellanet no solo satisfizo la obligación contraída con el señor José Manuel Pérez Reyes en febrero de 2013 de ciento quince mil ($115,000) dólares, sino que pagó veintiséis mil setecientos ochenta y dos dólares con cuarenta y cuatro centavos ($26,782.44) adicionales a la obligación acordada en febrero de 2013.

En desacuerdo, el 13 de enero de 2026, Constructora del Río presentó una *Solicitud de Reconsideración*, mientras que la parte demandada presentó su *Oposición [...]* el 28 de enero de 2026. No obstante, el 12 de febrero de 2026, el foro primario emitió una *Orden* declarando *no ha lugar* a la solicitud de reconsideración.

Inconforme aun, el 16 de marzo de 2026, la apelante compareció ante *nos* mediante *apelación* alegando la comisión de los siguientes errores:

**Primer señalamiento de error**: Erró el Tribunal de Primera Instancia al adjudicar la Reconvención y dictar sentencia afectando derechos de terceros que no fueron acumulados como partes indispensables, privando al tribunal de jurisdicción para adjudicar la controversia.

**Segundo señalamiento de error**: Erró el Tribunal de Primera Instancia al declarar que José Manuel Pérez

Malavé era un "tenedor de mala fe" de un pagaré hipotecario sin que dicha persona fuese parte en el pleito ni el tribunal tuviese jurisdicción sobre su persona.

**Tercer señalamiento de error**: Erró el Tribunal de Primera Instancia al imponer un remedio imposible de cumplir al ordenar a Constructora del Río, Inc. recuperar y entregar un pagaré hipotecario que el propio tribunal reconoció no se encuentra en su posesión.

**Cuarto señalamiento de error**: Erró el Tribunal de Primera Instancia al aplicar la doctrina de enriquecimiento injusto sin que existiera prueba de enriquecimiento alguno por parte de Constructora del Río, Inc. según surge de la propia sentencia.

**Quinto señalamiento de error**: Erró el Tribunal de Primera Instancia al adjudicar la Reconvención luego de haber desestimado la Demanda principal, cuando la reclamación reconvencional no podía resolverse válidamente sin la presencia de terceros indispensables.

**Sexto señalamiento de error**: Erró el Tribunal de Primera Instancia al aplicar la presunción adversa de la Regla 304(5) de Evidencia respecto a testigos que habían sido anunciados exclusivamente para probar las alegaciones de la demanda principal, ya desestimada.

Examinado el recurso ante nuestra consideración, el 19 de marzo de 2026, emitimos una *Resolución* mediante la cual le concedimos un término de diez (10) días a la parte apelada para presentar sus objeciones a la transcripción, así como un término de veinte (20) días para presentar su escrito en oposición al recurso, a contarse a partir desde que se acogiera la transcripción presentada. En cumplimiento, el 24 de abril de 2026, la parte apelada compareció ante este foro intermedio mediante *Moción de la Parte Apelada, en Cumplimiento de "Resolución"*. Luego, el 15 de abril de 2026, la parte apelada presentó su *Alegato de la Parte Apelada*.

Contando con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A. El derecho de contratos**

Nuestro sistema de derecho permite la libertad de contratación; siempre y cuando, los pactos, cláusulas y condiciones

no sean contrarios a la ley, la moral o al orden público.[1] Art. 1207 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 3372. Si se cumple con lo dispuesto, el contrato tendrá fuerza de ley entre las partes, por lo que ambas se obligan al cumplimiento de lo allí pactado y de sus consecuencias. Arts. 1044 y 1210 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 2994 y 3375, respectivamente. En adición, "cuando los términos de un contrato son claros y no crean ambigüedades, estos se aplicarán en atención al sentido literal que tengan". *CFSE v. Unión de Médicos*, 170 DPR 443, 450 (2007).

A su vez, los contratos existen desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa o a prestar algún servicio. Art. 1206 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 3371; *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 886 (2008); *Collazo Vázquez v. Huertas Infante*, 171 DPR 84, 102 (2007). También, la existencia de un contrato se constata cuando concurren los siguientes requisitos: (1) consentimiento de los contratantes; (2) objeto cierto que sea materia del contrato; y (3) causa de la obligación que se establezca. Art. 1213 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 3391; *García Reyes v. Cruz Auto Corp., supra*, págs. 885-886; *Rivera v. PRAICO*, 167 DPR 227, 232 (2006). Una vez concurren las condiciones esenciales para su validez, un contrato es obligatorio "cualquiera que sea la forma en que se haya celebrado". Art. 1230 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 3451.

Del mismo modo, nuestro ordenamiento jurídico reconoce que para que una deuda sea considerada paga, el prestatario tiene que entregar la cosa o hecho que establecía la obligación. Art 1111 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 3161. Sin

---

[1] Aunque el Código Civil citado, Código Civil de Puerto Rico de 1930, fue derogado por la Ley Núm. 55-2020, conocido como Código Civil de Puerto Rico, hacemos referencia al primero por ser el que estaba vigente a la fecha de la controversia de autos.

embargo, no podrá obligarse al acreedor a recibir el pago parcial, a menos que así lo autorice el contrato entre las partes. Art. 1123 Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 3173.

## B. Parte indispensable

La Regla 16.1 de Procedimiento Civil, 32 LPRA Ap. V, dispone lo atinente a la acumulación de una parte indispensable. En específico, la referida regla establece que: "[l]as personas que tengan un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas, según corresponda. Cuando una persona que deba unirse como demandante rehúse hacerlo, podrá unirse como demandada".

Cónsono con lo anterior, una parte indispensable se ha definido como:

> [A]quella que tiene tal interés en la cuestión envuelta en la controversia que no puede dictarse un decreto final entre las partes en la acción sin lesionar y afectar radicalmente su interés, o sin permitir que la controversia quede en tal estado que su determinación final haya de ser inconsistente con la equidad y una conciencia limpia. *Cirino González v. Adm. Corrección et al.*, 190 DPR 14, 46 (2014).

En esencia, la precitada regla pretende: (i) proteger las personas ausentes de los posibles efectos perjudiciales que pueda ocasionarles la resolución del caso; (ii) emitir una determinación completa; y (iii) evitar la multiplicidad de pleitos. *Cirino González v. Adm. Corrección et al., supra*, pág. 46; *Rodríguez Rodríguez v. Moreno Rodríguez,* 135 DPR 623, 627-628 (1994).

Al determinar si una persona es una parte indispensable en un pleito, se requiere un enfoque pragmático e individualizado, al tenor de las particularidades de cada caso. *García Colón et al. v. Sucn. González*, 178 DPR 527, 549-550 (2010). En ese sentido, el tribunal deberá evaluar los intereses involucrados y distinguir entre los diversos géneros de casos. *Deliz et als. v. Igartúa et als.*, 158 DPR 403, 434 (2003). Ello "exige una evaluación jurídica de factores tales como tiempo, lugar, modo, alegaciones, prueba, clase de derechos,

intereses en conflicto, resultado y formalidad". *Íd.*, citando a *Sánchez v. Sánchez,* 154 DPR 645, 678 (2001). A su vez, deberá examinar si el tribunal "podrá hacer justicia y conceder un remedio final y completo sin afectar los intereses del ausente". *Pérez Rosa v. Morales Rosado,* 172 DPR 216, 223 (2007); J.A. Echevarría Vargas, *Procedimiento Civil Puertorriqueño,* 1era ed. rev., 2012, págs. 139-141.

Dado a la importancia de una parte indispensable, el hecho de no acumularla podría conllevar la desestimación del pleito. *Cirino González v. Adm. Corrección et al.*, *supra,* 46-47. Ahora bien, no significa que se desestimará la causa de acción automáticamente. Ante esa circunstancia, el tribunal puede brindarle la oportunidad a una parte de traer a la parte omitida, siempre que pueda asumir jurisdicción sobre ésta. *Íd.* La falta de parte indispensable en un pleito es una defensa irrenunciable que puede presentarse en cualquier momento durante el proceso. *Inmob. Baleares et al. v. Benabe et al.*, 214 DPR 1109, 1121 (2024); *Watchtower Bible et al. v. Mun. Dorado I,* 192 DPR 73, 118 (2014); *Romero v. SLG Reyes,* 164 DPR 721, 733 (2005). Asimismo, los foros apelativos, deben levantar a instancia propia la falta de parte indispensable, debido a que esta incide sobre la jurisdicción del tribunal. *Íd.*

En fin, lo verdaderamente transcendental es que la ausencia de una parte indispensable priva de jurisdicción al tribunal. *García Colón et al. v. Sucn. González,* 178 DPR 527, 550 (2010). Como corolario, "la sentencia que se emita en ausencia de parte indispensable es nula". *Íd.*; *Unysis v. Ramallo Brothers,* 128 DPR 842, 859 (1991).

### C. Enriquecimiento injusto

La doctrina de enriquecimiento injusto es un principio general del derecho fundado en la equidad que permea todo nuestro ordenamiento jurídico. *Ortíz Andújar v. ELA,* 122 DPR 817, 822

(1988). Esta doctrina puede aplicarse a situaciones muy distintas entre sí, siempre y cuando tengan en común un elemento: el que de no aplicarse se perpetraría la inequidad de que alguien se enriqueciese injustamente en perjuicio de otro. *SLG Sánchez v. SLG Valentín*, 186 DPR 503, 515 (2012). Así, se recurre a esta figura "cuando la ley no ha previsto una situación en la que se produce un desplazamiento patrimonial que no encuentra una explicación razonable en el ordenamiento vigente". *Mun. Quebradillas v. Corp. Salud Lares*, 180 DPR 1003, 1019 (2011).

Para que proceda la aplicación de la figura del enriquecimiento injusto, es necesario que existan los siguientes supuestos: (1) la existencia de un enriquecimiento; (2) un empobrecimiento correlativo; (3) una conexión entre el empobrecimiento y el enriquecimiento; (4) falta de causa que justifique el enriquecimiento y; (5) inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa. *SLG Sánchez v. SLG Valentín, supra*, pág. 516. Véase, además, *Mun. Quebradillas v. Corp. Salud Lares, supra*, págs. 1019-1020; *Ortíz Andújar v. ELA, supra*, pág. 823.

### D. Reconvención

En nuestro ordenamiento procesal civil, existe el mecanismo de reconvención como parte del procedimiento judicial. Las Reglas de Procedimiento Civil lo divide en reconvenciones permisibles y reconvenciones compulsorias. Las primeras, "son aquellas que no surgen del mismo acto, omisión o evento que motivó la reclamación de la parte contra la que se presenta". *Consejo Titulares v. Gómez Estremera et al.*, 184 DPR 407, 424 (2012). Mientras que la reconvención compulsoria, "obliga a la parte demandada a formular, al momento de su contestación, cualquier reclamación compulsoria, es decir, cualquier reclamación que tenga contra la parte adversa, si ésta surge de la acción, omisión o evento que motiva la reclamación de la parte demandante". *Consejo Titulares v. Gómez*

*Estremera et al, supra,* pág. 424. Esta última deberá formularse a tiempo, puesto a que, de no hacerlo, "se renuncia a la causa de acción que la motiva, y quedarán totalmente adjudicados los hechos y reclamaciones sin que el demandado pueda presentar posteriormente una reclamación que haya surgido de los mismos eventos". *Consejo Titulares v. Gómez Estremera et al.*, *supra,* pág. 425.

### E. Ley de Transacciones Comerciales de Puerto Rico

La Ley Núm. 208-1995, según enmendada, conocida como la Ley de Transacciones Comerciales de Puerto Rico, 19 LPRA sec. 401 *et seq.* (Ley de Transacciones Comerciales), es una legislación especializada, que reglamenta los instrumentos negociables, los depósitos y cobros bancarios, así como las transferencias de fondos. La referida legislación se promulgó con el propósito de simplificar, clarificar y modernizar el derecho que rige las transacciones comerciales, uniformar el derecho entre las diversas jurisdicciones y permitir la continua expansión de las prácticas comerciales. Sec. 1-102 de la Ley de Transacciones Comerciales, 19 LPRA sec. 401; *DLJ Mortgage v. SLG Santiago-Ortiz,* 202 DPR 950, 963 (2019).

La Sec. 1-103 de la precitada legislación dispone que los principios generales del derecho en nuestra jurisdicción aplicarán de modo supletorio, salvo que sean desplazados por disposiciones particulares del propio estatuto. Sec. 1-103 de la Ley de Transacciones Comerciales, 19 LPRA sec. 402. Lo anterior es cónsono con la conocida regla de hermenéutica de nuestro ordenamiento jurídico que postula que una ley de naturaleza especial debe prevalecer sobre cualquier otro precepto aplicable que sea de carácter general. Art. 27 del Código Civil de 2020, 31 LPRA sec. 5349; *Cruz Consulting v. El Legado et al.*, 191 DPR 499, 508 (2014). Como resultado, el Tribunal Supremo ha determinado que solo cuando un aspecto de la controversia no pueda ser atendido

debidamente por la Ley de Transacciones Comerciales, podemos acudir en primer lugar, al Código de Comercio y, en última instancia, al Código Civil, como derecho supletorio. *St. Paul Fire & Marine v. Caguas Fed. Savs.*, 121 DPR 761, 766 (1998).

La Ley de Transacciones Comerciales define el término instrumento negociable como una promesa o una orden incondicional de pago de una cantidad específica de dinero. Sec. 2-104(a) de la Ley de Transacciones Comerciales, 19 LPRA sec. 504 (a). A su vez, deben concurrir los siguientes requisitos: (1) ser pagadero al portador o a la orden al momento de su emisión o cuando primero adviene a la posesión de un tenedor; (2) ser pagadero a la presentación o en una fecha específica, y; (3) no especificar otro compromiso que no sea el pago del dinero, pero la promesa u orden puede contener (i) un compromiso o poder para dar, mantener o proteger colateral para garantizar el pago, (ii) una autorización de poder al tenedor para admitir sentencia o liquidar la colateral o disponer de ella de otra forma o (iii) una renuncia al beneficio de cualquier ley que exista concediéndole una ventaja o protección a un deudor. *Íd.* El Tribunal Supremo distinguió el instrumento negociable como un documento de crédito que incorpora el derecho a cobrar una suma de dinero, al cual el derecho cambiario le confiere una especial facilidad de circulación. *SLG Haedo-López v. SLG Roldán-Rodríguez*, 203 DPR 324, 331 (2019).

Entre los instrumentos negociables modernos más utilizados en el comercio se destacan los cheques, los giros o letras de cambio y los pagarés. *COSSEC et al. v. González López et al.*, 179 DPR 793, 799 (2010). Sobre este último, la Ley de Transacciones Comerciales define un pagaré como una promesa, es decir, "un compromiso escrito de pagar dinero suscrito por la persona que se obliga a pagar." Sec. 2-103(a)(9) de la Ley de Transacciones Comerciales, 19 LPRA sec. 503(a)(9). Nuestro más Alto Foro ha particularizado que el pagaré al portador representa un crédito a ser pagado a la persona

que tenga el título en su poder, al que lo presenta – sea quien fuere – toda vez que el mismo se transmite por la simple entrega, sin ser necesario su endoso ni formalidad alguna. *SLG Haedo-López v. SLG Roldán-Rodríguez, supra,* pág. 331. Lo anterior, pues en el mismo no consta expresamente el nombre del titular y al momento de su constitución no se determina la identidad del acreedor. *Íd.*

Para fines de un instrumento negociable, una promesa u orden es incondicional a menos que establezca:

> i) una condición expresa de pago, ii) que la promesa u orden esté sujeta a, o regida por, otro escrito, o iii) que se establezcan en otro escrito los derechos u obligaciones respecto a la promesa u orden. Una referencia a otro escrito no convierte a la promesa u orden en una condicional.
>
> Sec. 2-106(a) de la Ley de Transacciones Comerciales, 19 LPRA sec. 506(a).

Un pagaré es pagadero a la presentación si el mismo así lo especifica o si de otra forma indica que es pagadero cuando el tenedor lo exija o si no contiene fecha específica de pago. Sec. 2-108 de la Ley de Transacciones Comerciales, 19 LPRA sec. 508(a).

Sobre la persona con derecho a exigir el cumplimiento del instrumento, la Ley de Transacciones Comerciales dispone que:

> significa (i) el tenedor del instrumento, (ii) una persona que no es tenedor pero está en posesión del instrumento y tiene los derechos de un tenedor, o (iii) una persona que no está en posesión del instrumento pero tiene derecho de exigir el cumplimiento del instrumento de acuerdo con las disposiciones de la Sección 2-309 y de la Sección 2-418(d). Una persona puede ser una persona con derecho a exigir el cumplimiento del instrumento aunque la persona no sea el dueño del instrumento o lo posea indebidamente.
>
> Sec. 2-301 de la Ley de Transacciones Comerciales, 19 LPRA sec. 601.

De otro lado, la Sección 2-302 de la Ley de Transacciones Comerciales establece que "tenedor de buena fe" significa el tenedor de un instrumento si:

> (1) cuando fue emitido o negociado al tenedor, el instrumento no tenía evidencia aparente de falsificación o alteración ni era de tal forma irregular o incompleto como para que debiera cuestionarse su autenticidad; y
>
> (2) el tenedor tomó el instrumento (i) por valor, (ii) de buena fe, (iii) sin tener aviso de que el

instrumento estuviese en mora o hubiese sido desatendido o de que existiese un incumplimiento no subsanado respecto al pago de otro instrumento emitido como parte de la misma serie, (iv) sin tener aviso de que el instrumento contiene una firma no autorizada o ha sido alterado, (v) sin tener aviso de la existencia de una reclamación contra el instrumento de las descritas en la Sección 2-306, y (vi) sin tener aviso de que una parte tenga una defensa o reclamación de resarcimiento de las descritas en la Sección 2-305(a).

(b) [...]

(c) Salvo en la medida que un cedente o predecesor en derecho tenga los derechos de un tenedor de buena fe, una persona no adquiere derechos de tenedor de buena fe de un instrumento adquirido (i) mediante procedimiento legal o por compra en una ejecución, quiebra o venta por el acreedor u otro procedimiento similar, (ii) por compra como parte de una venta a granel hecha fuera del curso ordinario de los negocios del transmitente, o (iii) como sucesor en derecho en una sucesión o en otra organización.

(d) Si, bajo las disposiciones de la Sección 2-303(a)(1), la promesa de cumplimiento que es la causa para la emisión o negociación de un instrumento ha sido parcialmente cumplida, el tenedor puede reclamar sus derechos como tenedor de buena fe del instrumento únicamente por la porción de la cantidad pagadera bajo los términos del instrumento equivalente al valor del cumplimiento parcial dividido por el valor del cumplimiento prometido.

(e) Si (i) la persona con derecho a exigir el cumplimiento del instrumento solamente tiene una garantía mobiliaria sobre el instrumento, y (ii) la persona obligada a pagar el instrumento tiene una defensa, reclamación por resarcimiento o reclamación contra el instrumento que se puede reclamar contra la persona que otorgó la garantía mobiliaria, la persona con derecho a exigir el cumplimiento del instrumento puede reclamar sus derechos como tenedor de buena fe solamente hasta una cantidad pagadera bajo los términos del instrumento que, a la fecha en que se exija el cumplimiento del instrumento, no exceda la cantidad de la obligación garantizada pendiente de pago.

[...]

Sec. 2-302 de la Ley de Transacciones Comerciales, 19 LPRA sec. 602.

Por otro lado, la Ley de Transacciones Comerciales dispone que la cesión de un instrumento negociable ocurre cuando se entrega por una persona que no sea su emisor con el propósito de darle a la persona que lo recibe el derecho a exigir el cumplimiento del instrumento. Sec. 2-203(a) de la Ley de Transacciones

Comerciales, 19 LPRA sec. 553 (a). Así las cosas, la cesión de un instrumento, sea esta una negociación o no, "confiere al cesionario cualquier derecho del cedente a exigir el cumplimiento del instrumento, incluyendo cualquier derecho que tuviese como tenedor de buena fe, pero el cesionario no podrá adquirir los derechos de un tenedor de buena fe si el cesionario participó en un fraude o ilegalidad que afectó al instrumento". Sec. 2-203(b) de la Ley de Transacciones Comerciales, 19 LPRA sec. 553 (b).

Así pues, la persona que tome un instrumento, que no sea una con derechos de tenedor de buena fe, está sujeta a una reclamación de derecho de propiedad o de posesión sobre el instrumento o su producto, incluyendo una reclamación para rescindir una negociación y recuperar el instrumento o su producto. Sec. 2-306 de la Ley de Transacciones Comerciales, 19 LPRA sec. 606.

### III.

Nos corresponde determinar si el foro primario incidió al determinar que el señor Pérez Malavé era un tenedor de mala fe, sin que este formara parte del pleito, y al ordenar que la parte apelante recuperara el pagaré transferido con el propósito de que lo entregara al deudor para su correspondiente cancelación conforme a lo establecido en la Ley Núm. 210 de 8 de diciembre de 2015, según enmendada, también conocida como Ley del Registro de la Propiedad Inmobiliaria del Estado Libre Asociado de Puerto Rico. *Veamos.*

Por estar estrechamente relacionados los errores señalados como primero, segundo y quinto en el recurso de apelación bajo nuestra consideración, procedemos a discutirlos en conjunto. En síntesis, la parte apelante planteó que erró el foro de instancia al adjudicar la Reconvención y dictar sentencia afectando derechos de terceros que no fueron acumulados como partes indispensables en el pleito. A su vez, sostuvo que el foro *a quo* incidió al declarar que

el señor Pérez Malavé era "tenedor de mala fe" de un pagaré hipotecario sin que dicha persona fuese parte en el pleito ni el tribunal tuviese jurisdicción sobre su persona. Además, arguyó que erró el tribunal al adjudicar la Reconvención luego de haber desestimado la Demanda principal, cuando la reclamación no podía resolverse válidamente sin la presencia de terceros indispensables.

A su juicio, el foro primario carecía de jurisdicción sobre la persona del señor Pérez Malavé, lo que impedía adjudicar válidamente cualquier controversia relacionada con su posesión, titularidad, exigibilidad o eventual cancelación del pagaré. Señaló, a su vez, que el tribunal le ordenó recobrar, entregar o declarar perdido un pagaré respecto al cual el propio foro reconoció que dicha parte no era tenedora, no lo poseía y que el instrumento ya había sido transferido. Además, puntualizó que el verdadero tenedor del pagaré nunca fue traído al pleito, pese a ostentar un interés directo, real e inmediato sobre el instrumento negociable. Por lo que, aseveró que el dictamen apelado adolecía de nulidad absoluta por la ausencia de parte indispensable.

Por su parte, la parte apelada arguyó que, debido a que el señor Pérez Malavé no era un tenedor de buena fe, no podía ser considerado una parte indispensable en el proceso sin la cual el foro primario estuviere impedido de adjudicar la reconvención y proveer remedios con jurisdicción para ello. A su vez, sostuvo que los planteamientos sobre falta de parte indispensable, así como de falta de jurisdicción para adjudicar la Reconvención, ante la desestimación de la Demanda, fueron efectuados en corte abierta y posteriormente realizados por escrito, siendo denegados en ambas ocasiones, sin que la parte apelada acudiera oportunamente ante este foro intermedio o el señor Pérez Malavé solicitara intervención oportuna en el pleito. Por tal razón, aseveró que dichos dictámenes advinieron finales y firmes, de manera que este tribunal no poseía jurisdicción para revisar los mismos.

Luego de un análisis detenido y sosegado del expediente ante *nos,* en unión a los escritos de ambas partes ante el foro primario, colegimos que procede revocar la *Sentencia* apelada. En el caso que nos ocupa, la controversia medular del pleito no gira en torno a la credibilidad concedida por el foro primario a la prueba testifical y documental vertida durante el juicio ni en torno a las determinaciones de hechos formuladas por dicho foro sino que, por el contrario, el eje principal de la misma recae sobre aspectos de derecho. Ello toda vez que el defecto que impide sostener el dictamen apelado es uno de naturaleza procesal y jurisdiccional. *Veamos.*

De los autos ante nuestra consideración se desprende que el propio tribunal de instancia determinó que el pagaré hipotecario objeto de la controversia fue transferido a favor del señor Pérez Malavé y que, al momento de iniciarse el juicio en su fondo, éste era el tenedor del instrumento en cuestión. Precisamente, por tal razón, el foro primario concluyó que correspondía desestimar la *Demanda* por falta de legitimación activa de la parte apelante. Resultaría incongruente concluir que el tenedor del instrumento continuaba siendo la parte apelante cuando el propio tribunal incluyó en sus determinaciones de hechos que el señor Pérez Malavé era el tenedor del pagaré.[2]

Ahora bien, una vez desestimada la reclamación principal, el tribunal procedió a adjudicar la Reconvención presentada por el señor Avellanet Quiñones. Para ello concluyó que éste había satisfecho la totalidad de la obligación relacionada con la compraventa del inmueble y que, además, efectuó pagos en exceso por la suma de $26,782.44. Como consecuencia de ello, ordenó a la parte apelante devolver dicha suma y recuperar el pagaré transferido

---

[2] Específicamente, en su determinación de hechos #36, el foro de instancia dispuso lo siguiente: "El 18 de junio de 2025, previo al comienzo del juicio, el Tribunal le solicitó esa información a la parte demandante, se confirmó que el tenedor del pagaré era José Manuel Pérez Malavé, quien no era parte del caso. Se desestimó la demanda y se procedió a atender las alegaciones presentadas en la reconvención. Véase entrada [228] de SUMAC.

para entregarlo al deudor con el propósito de que fuera cancelado. Asimismo, determinó que el señor Pérez Malavé no era un tenedor de buena fe.

A nuestro juicio, tales determinaciones no podían emitirse válidamente en ausencia del señor Pérez Malavé. Aunque la Reconvención fue presentada como una reclamación para recuperar cantidades alegadamente pagadas en exceso, la adjudicación de dicha reclamación requería necesariamente determinar la existencia, cuantía y extinción de la obligación representada por el instrumento negociable. En efecto, la conclusión de que la parte apelada efectuó pagos en exceso presupone que la obligación garantizada por el instrumento quedó totalmente satisfecha y que no quedaba balance alguno pendiente de pago. De igual forma, la orden dirigida a recuperar y cancelar el pagaré, así como la expresión relativa a la condición de tenedor de buena o mala fe del señor Pérez Malavé, inciden directamente sobre los derechos e intereses de este respecto al instrumento. En tales circunstancias, no resulta posible separar completamente la reclamación adjudicada por el foro primario de los aspectos relacionados con la vigencia, exigibilidad y los efectos jurídicos del pagaré. Resolver una supone necesariamente adjudicar aspectos sustanciales de la otra, sin que el señor Pérez Malavé pueda expresar su posición sobre la reclamación.

Recordemos que para determinar si en efecto el señor Pérez Malavé es o no una parte indispensable, debemos analizar si este tiene tal interés en el presente caso que no pudiese dictarse un decreto final entre las partes sin lesionar y afectar radicalmente su interés, o sin permitir que la controversia quede en tal estado que su determinación final haya de ser inconsistente con la equidad y una conciencia limpia. *Cirino González v. Adm. Corrección et al., supra,* pág. 46.

En ese contexto, resulta ineludible concluir que cualquier determinación judicial sobre la posesión, titularidad, exigibilidad o eventual cancelación del pagaré incide directamente sobre los derechos del tenedor del pagaré, es decir, sobre el señor Pérez Malavé. Resolver la controversia en su ausencia no solo lesiona sus derechos, sino que también expone el dictamen a inconsistencias futuras y atentaría contra los principios de equidad que rigen nuestro ordenamiento jurídico. Ello pues, sin la presencia del señor Pérez Malavé, las cuestiones litigiosas no pueden ser adjudicadas correctamente, ya que sus derechos fueron igualmente afectados por la determinación judicial emitida. Por consiguiente, su participación en el pleito era indispensable.

A tenor con lo anterior, es forzoso concluir que el señor Pérez Malavé poseía un interés real o e inmediato en el pleito que podía, y en efecto, quedó destruido o afectado por el dictamen emitido por el foro primario. Por consiguiente, concluimos que el señor Pérez Malavé era una parte indispensable para la adjudicación de la reclamación de la Reconvención en la medida en que esta requería determinar asuntos que afectaban directamente sus alegados derechos sobre el pagaré hipotecario. Por tal razón, erró el Tribunal de Primera Instancia, Sala Superior de Aibonito al adjudicar la Reconvención en ausencia de una parte indispensable en el pleito. Procede, por lo tanto, la desestimación de la demanda por falta de parte indispensable.

Por motivo de que procede que se revoque la *Sentencia* apelada, se torna innecesaria la discusión de los señalamientos de error enumerados como tercero, cuarto y sexto por la parte apelante.

**IV.**

Por los fundamentos antes expuestos, *revocamos* la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones